**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MICHAEL IPPOLITO,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE CITY OF BROCKTON, THE BROCKTON POLICE DEPARTMENT, KEVIN MCCASKILL, in his personal capacity and in his official capacity as Principal of Brockton High School.**<br><br>**Defendants.** | **NO. 1:25-CV-13893** |

**FIRST AMENDED COMPLAINT**

**INTRODUCTION**

In this action, the Plaintiff, Michael Ippolito (the "Plaintiff" or "Mr. Ippolito"), seeks redress for civil rights violations of the First, Fourth, and Fourteenth Amendments of the United States Constitution; deprivation of civil rights pursuant to 42 U.S.C. § 1983, by the Principal of Brockton High School, Kevin McCaskill ("McCaskill"), and various other City of Brockton's officials and employees. Additionally, Mr. Ippolito seeks redress against McCaskill in his individual capacity for intentional infliction of emotional distress, substantial violations of his rights under the Massachusetts Constitution; and M.G.L. c. 214, § 1B (violation of his right to privacy).

## JURISDICTION AND VENUE

1. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343, and on the pendent jurisdiction of this Court to entertain claims arising under state law, pursuant to 28 U.S.C. § 1367.

2. This action is properly in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial portion of the injury, events, and/or omissions giving rise to this controversy occurred in this judicial district.

## PARTIES

3. Michael Ippolito is an adult resident of 52 South Street, Apt. A, Bridgewater, Plymouth County, MA 02324. Mr. Ippolito is a mathematics teacher with Professional Teacher Status who was employed by the City of Brockton and, during all relevant times, was an employee of and had a contract with the City of Brockton by and through the collective bargaining agreement as a member of the Brockton Education Association ("BEA").

4. Defendant Kevin McCaskill resides, on information and belief, in 22 Hawthorne Street Apt #1, Boston, Suffolk County, Massachusetts 02119. McCaskill is the current Principal of Brockton High School. McCaskill is being sued in his personal capacity and his official capacity as Principal of Brockton High School.

5. Defendant City of Brockton ("Brockton" or the "City") is a Massachusetts-incorporated municipality operating under the laws of Massachusetts and ordinances established by the City of Brockton. Its principal office is located at Brockton City Hall, 45 School Street, Brockton, Plymouth County, MA 02301. During all relevant times, Brockton was the public employer of the Plaintiff and Defendant McCaskill.

6. Defendant Brockton Police Department ("BPD") is a subdivision of the City of Brockton. Its principal office is located at 7 Commercial Street, Brockton, Plymouth County, MA 02302.

## FACTUAL BACKGROUND

**Mr. Ippolito's Work History And Job Performance.**

7. Mr. Ippolito is a long-time educator at the Brockton Public Schools ("BPS"), teaching there for nine years. He is a 2000 graduate of Brockton High School ("BHS") and a member of the BEA. He also enjoys Professional Teacher Status.

8. Mr. Ippolito graduated from Bridgewater State University ("BSU") in 2011 with a bachelor's degree in physics. He received professional licensure to teach high school mathematics in 2012 and middle school mathematics in 2013.

9. Mr. Ippolito is, and has been, for nine years, a vocal advocate for the BPS' diverse and often disadvantaged student population and is a resolute believer in giving back to his community. His commitment and ability to inspire students and his community are evidenced by:

a. Serving as Chair of the BPS Excellence Team, Community and Engagement Subcommittee;

b. Serving as Member of the BPS Steering Committee for Training and Professional Development, and;

c. Being selected as "Inspirational Teacher" for National Honor Society Inductees in 2021 and 2022.

**BPS's Teacher Shortage Leads To Students Without Teachers And Dangerous Conditions.**

10. BPS has experienced rampant academic and financial turmoil and safety lapses.

11. On May 15, 2023, three days after stabbings on the BHS campus, the BPS announced that there would be massive layoffs, resulting in the loss of four hundred thirty-five (435) teachers between June and September 2023.

12. On June 6, 2023, Mr. Ippolito read a statement he had drafted at a School Committee Meeting. Mr. Ippolito had drafted, circulated the statement, and obtained the signatures of over 200 teachers, guidance counselors, support staff, and school administrators prior to the meeting.

13. At this meeting, Mr. Ippolito had organized a union coalition in order to pressure the city of Brockton to prioritize city funds for the schools and to refrain from the planned cuts. His efforts were unavailing, however, and the planned layoffs continued. But the die was cast, and Ippolito was now a target for the School administrators.

14. Due to the massive layoffs, BHS, the 2023-2024 school year, saw one thousand two hundred (1,200) students daily sitting in the cafeteria with no class time or teachers listed on their schedules. The Acting Superintendent at the time, Dr. James Cobbs, stated, in the Boston Globe on November 9, 2023, "*nearly 1,200 students at the high school are spending part of their day that should be instructional time sitting in the cafeteria.*"

15. The massive teacher shortages at BHS led to several members of the School Committee requesting, on February 15, 2024, that Governor Maura Healey order the National Guard to provide security at the school.

16. In the same school year, BHS saw a total of four different principals or acting principals, while suffering from severe staffing shortage and a multi-million-dollar budget deficit.

17. On January 1, 2024, McCaskill was hired as the ***fourth*** Principal of BHS during the 2023-2024 school year.

18. Once becoming the principal, McCaskill had students placed in classrooms with substitutes and guidance counselors, who were encouraged to work overtime to supervise them during their prep periods. These sessions were not genuine instructional classes, however; students were simply seated under supervision, creating the appearance of structured classroom activity when visitors or state officials were present, preventing cafeterias from appearing overcrowded with unsupervised students.

19. McCaskill's tactic was the subject of criticism, including from Mr. Ippolito.

20. As indicated above, Mr. Ippolito was one of the more vocal critics of the City and the School Department.

21. On information and belief, the City hired McCaskill to, among other things, silence and eliminate "undesirable" staff as part of its policy, practice and custom designed to silence vehement critics of the City and its School Department.

22. As detailed herein, Mr. Ippolito was one of the many staff members targeted, as a matter of Brockton City and School Department policy and practice, due to his advocacy for investment in students and teachers.

**Mr. Ippolito's Advocacy Work**

23. Having witnessed the impact of the teacher shortage and believing that students were being warehoused and not educated, Mr. Ippolito was very outspoken and often gave public speeches, criticizing the school administration and the City.

24. After the June 2023 School Committee speech, Mr. Ippolito continued to publicly advocate during the 2023-24 school year.

25. On February 15, 2024, at a Brockton Education Association (the "BEA") meeting attended by state-level elected Brockton representatives, Mr. Ippolito gave a speech detailing the City's fiscal mismanagement and its consequences for the education and safety of students.

26. On February 29, 2024, Mr. Ippolito helped organize and manage a presentation by Massachusetts Budget and Policy Center ("MassBudget") regarding the City's budgetary issues and its adverse impacts on BPS students, which a state legislator attended.

27. Mr. Ippolito also engaged in various union activities, again, criticizing the school and city administrations.

**<u>Retaliation Against Mr. Ippolito</u>**

28. Frustrated by Mr. Ippolito's activism and outspoken criticism, McCaskill, as part of a designed scheme and practice, beginning in February 2024, engaged in a series of retaliatory actions against Mr. Ippolito, which culminated in violations of his constitutional rights, in an effort to remove him from his position.

29. The City's campaign against Mr. Ippolito included making or encouraging others to make false allegations regarding Mr. Ippolito's behavior and questioning his activities in advocating for his students and community.

30. For example, on March 18, 2024, Mr. Ippolito issued a candidate statement for the position of Vice President of the BEA.

31. Two days later and seventy-five minutes before the BEA elections, McCaskill called Mr. Ippolito into his office, where he presented a document allegedly received on March 15, containing serious student-originated allegations against him that, if not pretextual, should have been addressed immediately (on March 15).

32. Mr. Ippolito refuted the claims and provided documentation of a special education teacher's inappropriate conduct toward a female student. He perceived the timing and McCaskill's delay, together with the decision not to remove the student from his class, as evidence that McCaskill understood the allegations to be unfounded.

33. This was an attempt, designed and implemented by Brockton through McCaskill, to undermine Mr. Ippolito's BEA candidacy, thus keeping him from a high-profile position from which he could continue his critique of Brockton's and McCaskill's administration.

34. Despite the documentation, McCaskill emailed Kathleen F. Moran, Ed.D. ("Dr. Moran"), the Assistant Superintendent, and head of Human Resources for BPS, falsely accusing Mr. Ippolito of taking actions that were "*detrimental to the school community*" at BHS.

35. McCaskill communicated with Dr. Moran regarding his efforts to specifically keep administrators apprised of his progress in implementing the City's retaliation program.

**<u>The Unlawful Restriction of Mr. Ippolito's Freedom</u>**

36. On March 27, 2024, McCaskill, at the direction of the City, escalated his retaliatory behavior towards Mr. Ippolito, behavior which culminated in a shocking violation of Mr. Ippolito's civil rights.

37. That afternoon, McCaskill contacted a Brockton Police Officer assigned to BHS, and falsely claimed that Mr. Ippolito had a "*change in mental status*," requiring him to be "*pink papered*," despite Mr. Ippolito exhibiting no dangerous behavior.[1]

[1] "Pink papering" or "sectioning" are common terms for an order issued by authorized actors to restrain an allegedly mentally ill individual and take that individual to a hospital in the belief that failure to hospitalize would create a likelihood of serious and immediate harm to himself or others due to suicidality or homicidally.

38. Civil commitment implicates various constitutional rights, including, inter alia, the Fourth Amendment, right against unreasonable search and seizure.

39. The City had a duty and obligation to properly train state actors, including police officers, who are authorized to assess the need for, and to implement properly and legally, civil commitment proceedings.

40. Upon information and belief, City actors, including police officers, have implemented civil commitment proceedings, resulting in the institutionalization and confinement of individuals present in Brockton.

41. Despite its knowledge that police officers frequently engage with individuals who are, or may be, in mental health crises, the City failed to provide adequate training, supervision, or guidance to its police officers regarding the mental health assessment of individuals and the proper guidelines and procedures for civilly committing such individuals.

42. Upon information and belief, this has led to many individuals being improperly civilly committed by Brockton police officers.

43. Ippolito was one such individual victimized by the City of Brockton's policy of targeting critics for removal and by its inadequate training of police officers in mental health assessment and civil commitment standards.

44. Specifically, Mr. Ippolito had a free period in that afternoon for teacher preparation. During this free period, Assistant Principal, Kevin Rooney ("Rooney"), approached Mr. Ippolito, at the behest of McCaskill, and asked him to follow Rooney to his office.

45. Rooney told Mr. Ippolito that "*[i]t's no big deal, if it was, I'd tell you,*" and that "*[t]his will only be a couple minutes, I just need to ask you about something*." Mr. Ippolito followed Rooney into his office.

46. Once in the office, Rooney asked Mr. Ippolito about (1) "*laying on desks*"; and (2) "*rolling around on the floor*," citing a student report of the alleged behaviors. Rooney also asked Mr. Ippolito whether he had been crying downstairs, which Mr. Ippolito denied.

47. McCaskill then entered Rooney's office, accompanied by two Brockton Police officers. Mr. Ippolito, unsure of what was happening, asked for an explanation. One of the officers replied that there were individuals "*concerned about him*" and that they intended to have him evaluated.

48. Immediately after the officer spoke, Mr. Ippolito turned and saw McCaskill tilt his head to the right, smiling, and making a clicking noise.

49. The two police officers and McCaskill then stepped out of the room while Rooney remained. A woman named Casandra Dos Anjos then entered, reiterating that people were "*concerned*" and "*just want[ed] to make sure you are all right*." She also asked about (1) "*laying on desks*" and (2) "*rolling on the floor*."

50. Mr. Ippolito told Ms. Dos Anjos that he "*was fine*." She, however, stated that the administration wanted him to be evaluated and that the evaluation was "*voluntary*," but would help ease their concerns.

51. Ms. Dos Anjos did not inform Mr. Ippolito that he was being removed from the school or sectioned, and Mr. Ippolito therefore believed (incorrectly) that he was free to leave, as the school day was over.

52. Upon exiting Rooney's office, Mr. Ippolito encountered six men and a stretcher pinned against the wall by an EMT. Two additional EMTs, the two officers from earlier, and McCaskill surrounded him.

53. McCaskill then ordered Mr. Ippolito to, "*Get on the stretcher!*" Mr. Ippolito responded, "*No, no, no, no. She said it was optional. I'd like to go home now*." One of the police officers, following McCaskill's directive, ordered Mr. Ippolito to "*Get on that stretcher now or else we're gonna put you on it!*"

54. Mr. Ippolito then looked up at McCaskill. He once again tilted his head, smiled, and made that same clicking noise.

55. Ms. Dos Anjos, a Licensed Mental Health Counselor, not a physician, advanced practice registered nurse, licensed psychologist, or licensed independent clinical social worker, does not have the authority to initiate involuntary admission.

56. Nonetheless, the police report of the incident states that Ms. Dos Anjos made the decision to involuntarily transport Mr. Ippolito. There is no indication that a qualified individual properly admitted Mr. Ippolito for involuntary admission.

57. Ms. Dos Anjos is, upon information and belief, an employee of Community Counseling of Bristol County, and a contractor acting on behalf and at the direction of the City and, in this case, following the direction of McCaskill.

58. Similarly, the police report contains no facts supporting a reasonable belief by McCaskill or the officers that he posed a serious threat to himself or others and identifies no witnesses to the alleged behavior. The report notes only that McCaskill told an officer that Mr. Ippolito was experiencing "*a change in mental status*." Ms. Dos Anjos described a "*manic state of mind*" but made no mention of any danger to Mr. Ippolito or others.

59. Similarly, the admission notes from Good Samaritan Medical Center ("Good Samaritan") show that Mr. Ippolito was consistently "*calm and cooperative*" throughout his stay, exhibiting no suicidal or homicidal ideation or threat to himself or others. Records from

Pembroke Hospital, to which he was transferred, confirm this. The nurse manager at Pembroke noted that Mr. Ippolito was "*productive throughout the day and had a positive outlook, [was] helpful and supportive with other patients, and respectful in his interactions with both staff and peers*."

60. Mr. Ippolito, based upon the illegal actions of McCaskill and the Brockton Police Department (who did not follow proper procedure and exceeded their statutory grant) was held against his will at Pembroke Hospital until April 5, 2024, when he signed himself out pursuant to Section 12. No medical professional challenged the discharge.

61. Instead, this was a situation created by McCaskill to pink-paper Mr. Ippolito in retaliation for his union activity and outspoken criticism of the City's and the BPS's poor administration and financial and other decision making.

62. Indeed, despite the purported imminent threat to the safety of Mr. Ippolito and/or others on March 27, 2024, McCaskill did not call the emergency "911" number, nor did he contact the Brockton Fire Department, which would have dispatched trained paramedics to the scene of an alleged emergency.

63. Rather, to maximize embarrassment and distress, McCaskill timed his call to the police to ensure that a confrontation with Mr. Ippolito would take place during the final period of the school day, when students would be passing the administrative offices.

64. McCaskill's purported reasons, as detailed in the police report, were as follows: "*Random statements about good deeds . . . and various achievements";* Inability to *"stay on the same topic" and "conversations . . . all over the place";* Speaking quickly; and *"laying on the floor and desk and walking in random classrooms that were in session speaking*." None of these, even assuming McCaskill's account is true, which they are not, meet the definition of "likelihood

of serious harm" required under the Emergency Admissions Law, M.G.L. c. 123, § 12 ("Section 12").

65. As a result of the involuntary admission, Mr. Ippolito missed his 42nd birthday on Easter Sunday, March 31st, and his father's 79th birthday celebration, which he was supposed to host on March 28th.

**BHS Prevents Mr. Ippolito From Returning To Work.**

66. Even after Mr. Ippolito discharged himself from the hospital, and no medical professional challenged that discharge, BHS refused to allow Mr. Ippolito to return to work.

67. On April 18, 2024, Mr. Ippolito attended a meeting in which Dr. Moran informed him that he was required to produce medical documentation prior to returning to work. McCaskill, a Massachusetts Education Association union representative, and the local BEA President were also in attendance.

68. On April 19, 2024, Mr. Ippolito produced the documentation that Dr. Moran requested. Nevertheless, Dr. Moran placed Mr. Ippolito on paid administrative leave after he had not been paid since March 28, 2024, and required him to undergo an independent medical examination.

69. On April 22, 2024, Dr. Moran informed Mr. Ippolito by email of an "internal investigation" and barred him from all school property, preventing him from attending School Committee meetings and engaging in community and union advocacy. Dr. Moran also wrote: "*You are to make yourself available to my representatives who will be conducting the investigation*." No BPS representative ever contacted him regarding any investigation.

70. On May 3, 2024, Mr. Ippolito submitted an additional return-to-work letter from a medical professional, which Dr. Moran also rejected.

71. Despite rejecting the request to return to work, Dr. Moran, on the same day, allowed Mr. Ippolito to access school grounds for his annual volunteer DJ/MC event supporting the Brockton Signature Health Care Cancer Walk.

72. On June 3, 2024, Mr. Ippolito again attempted to return to work after Dr. Moran continued to attempt to force Mr. Ippolito into an independent medical examination. Dr. Moran stated, "*I was contacted by the nurse who is trying to schedule the exam. She said she has been reaching out to you*."

73. Despite providing clearance from his own medical providers, McCaskill and BPS refused to allow Mr. Ippolito to return to BHS to complete the 2023-2024 school year and insisted, throughout the remainder of the 2023-2024 school year, that Mr. Ippolito be psychologically evaluated by Brockton's own private evaluator.

74. Brockton refused to reinstate Mr. Ippolito for the 2024-25 school year.

**Mr. Ippolito Continues to Suffer.**

75. The City's unlawful conduct has resulted in stress on Mr. Ippolito and his family, as well as reputational harm. Mr. Ippolito's professional and community reputation has been severely damaged by the actions of McCaskill, the City, and the BPD.

76. The stigma of "paid leave," which implies wrongdoing, despite no finding, has also damaged Mr. Ippolito due to the actions of McCaskill, the City, and the BPD.

77. Mr. Ippolito has lost union and community leadership opportunities due to the actions of McCaskill, the City, and the BPD.

78. Mr. Ippolito has lost overtime opportunities and substantial wages due to the actions of McCaskill, the City, and the BPD.

79. Mr. Ippolito has incurred legal fees due to the actions of McCaskill, the City, and the BPD.

80. Mr. Ippolito has experienced awkward public encounters due to the actions of McCaskill, the City, and the BPD.

81. Mr. Ippolito is emotionally devastated and now fears retaliation for protected speech and advocacy due to the actions of McCaskill, the City, and the BPD.

**Physical and mental health impacts to Mr. Ippolito.**

82. Mr. Ipolito now suffers chronic stress and anxiety that manifest into physical symptoms, as documented by Mr. Ippolito's primary care doctor, due to the actions of McCaskill, the City, and the BPD.

83. Mr. Ippolito is depressed and demoralized, due to the actions of McCaskill, the City, and the BPD.

84. Mr. Ippolito suffers from sleep disruption with nightmares and fatigue, due to the actions of McCaskill, the City, and the BPD.

85. Mr. Ippolito suffers from intrusive thoughts, gastrointestinal issues, and chest pains, due to the actions of McCaskill, the City, and the BPD.

## COUNT I – VIOLATION OF 42 U.S.C. § 1983
**(against McCaskill in his official capacity, the City of Brockton, and the Brockton Police Department)**

86. Plaintiff repeats and incorporates by reference the allegations contained in Paragraphs 1-85 of the Complaint.

87. Under 42 U.S.C. § 1983, any person or municipality that, under color or law, deprives a citizen of the United States of a right secured by the Constitution or by federal law shall be liable to the injured party in an action at law or suit in equity.

88. Defendants caused the Plaintiff harm by depriving him of his constitutional rights to: (a) free speech under the First Amendment; (b) be secure against the unreasonable seizure of his person under the Fourth Amendment; and (c) Due Process under the Fourteenth Amendment. All such damage continues through this date.

89. The deprivation of Plaintiffs' constitutional rights was a result of City's and BPD' policy, practice, customer, and failure to properly train its employees.

**COUNT II – VIOLATION OF M.G.L. c. 12, § 11I – THE MASS. CIVIL RIGHTS ACT**
**(against McCaskill individually)**

90. Plaintiff repeats and incorporates by reference the allegations contained in Paragraphs 1-89 of the Complaint.

91. McCaskill acted in concert to inflict a wrong upon Mr. Ippolito by, among other things, concocting a scheme to unlawfully section Mr. Ippolito.

92. McCaskill fabricated charges of dangerousness by Mr. Ippolito in the furtherance of their plan to have Mr. Ippolito sectioned.

93. In support of this conspiracy, McCaskill participated in illegal concerted activities including a staged and false sectioning of Mr. Ippolito.

94. These actions caused Mr. Ippolito to be removed from the workplace, placed on leave, humiliated him, and caused him extreme anxiety and distress. As such, Mr. Ippolito's right to continued employment has been substantially interfered with and this interference was by way of "threats, intimidation or coercion."

95. As a result of the conduct of the Defendants, Mr. Ippolito's statutory rights were violated and he has suffered a loss of benefits, reputation, and earning capacity, as well as suffering severe emotional and physical pain and distress, and has incurred legal and medical costs. All such damage continues through this date.

**COUNT III – VIOLATION OF M.G.L. c. 214, § 1B**
**(against McCaskill individually)**

96. Plaintiff repeats and incorporates by reference the allegations contained in Paragraphs 1-95 of the Complaint.

97. Under M.G.L. c. 214, § 1B, a personnel shall have a right against unreasonable, substantial, or serious interference with his privacy.

98. McCaskill caused the Plaintiff harm through their unreasonable, substantial, and serious interference with his privacy by, *inter alia*, falsely sectioning and unlawfully transporting him by stretcher in front of his students and colleagues, and attempting to force him to undergo evaluation by a medical professional of their choosing. All such damage continues through this date.

**COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(against McCaskill individually)**

99. Plaintiff repeats and incorporates by reference the allegations contained in Paragraphs 1-98 of the Complaint.

100. McCaskill knew, or should have known, that his actions would likely result in emotional distress, including his concerted illegal actions in concocting a scheme to unlawfully section Mr. Ippolito, retaliating against him for his protected union activities and outspoken criticism of the lack of safety for students in BHS.

101. The specific conduct of McCaskill was extreme and outrageous and beyond all reasonable bounds of decency.

102. As a result of the conduct of McCaskill, Mr. Ippolito's rights have been violated and he has suffered a loss of benefits, reputation, and earning capacity, as well as suffering

severe emotional and physical pain and distress and has incurred legal and medical costs. All such damage continues through this date.

**PRAYERS FOR RELIEF**

WHEREFORE, the Plaintiff requests that this Court order the following:

a. Enter judgment in favor of the Plaintiff on all counts of this Complaint;

b. Award the Plaintiff an amount of money which will compensate him for any loss of wages and/or benefits incurred because of the unlawful acts;

c. Award the Plaintiff an amount of money which will fairly compensate him for his emotional and physical pain and suffering, humiliation and damage to his reputation and earning capacity;

d. Order that the Defendant pay the Plaintiff's cost and attorney's fees resulting from this action; and

e. Award such other and further relief as the Court deems just and proper to make the Plaintiff whole.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Respectfully Submitted,

MICHAEL IPPOLITO,

By his attorneys,

*/s/ John F. Tocci*

John F. Tocci, Esq., BBO# 562139
Hui Chen, Esq., BBO # 712934
Davis, Malm & D'Agostine
One Boston Place, 37th Floor
Boston, MA 02108
(617)-930-3837
(617)-589-3891
jtocci@davismalm.com
hchen@davismalm.com

Dated: March 10, 2026

**CERTIFICATION OF SERVICE**

I, Hui Chen, certify that on this 10th day of March 2026, the foregoing document was filed electronically through the ECF system and will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing.

*/s/ Hui Chen*_____
Hui Chen