**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MICHAEL IPPOLITO,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| v. ) | |
| ) | **Case No. 25-cv-13893-DJC** |
| **CITY OF BROCKTON, THE BROCKTON** ) | |
| **CITY POLICE DEPARTMENT and KEVIN** ) | |
| **McCASKILL, in his personal capacity and in** ) | |
| **his official capacity as Principal of Brockton** ) | |
| **High School** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM AND ORDER**

**CASPER, C. J.**                                                                 **June 21, 2026**

## I.    Introduction

Plaintiff Michael Ippolito ("Ippolito") has filed this lawsuit against Defendants City of Brockton ("Brockton"), the Brockton City Police Department ("BPD") and Kevin McCaskill, in his personal capacity and in his official capacity as a Principal of Brockton High School ("McCaskill") (collectively, "Defendants"). D. 1; D. 11. Against Brockton, BPD and McCaskill in his official capacity, Ippolito alleges in the first amended complaint ("FAC") violations of his First, Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 in connection with his involuntary hospital admission pursuant to Mass. Gen. L. c. 213, § 12 (Count I). D. 11. Against McCaskill, Ippolito also alleges violations of his rights under Mass. Gen. L. c. 12, § 11I (Count II)

1

and Mass. Gen. L. c. 214, § 1B (Count III) and intentional infliction of emotional distress (Count IV). Id. Defendants have now moved to dismiss the FAC under Fed. R. Civ. P. 12(b)(6). D. 14. For the reasons stated below, the Court ALLOWS Defendants' motion to dismiss, D. 14, as to Counts I-II but DENIES it as to Counts III-IV.

## II.    Standard of Review

Under Rule 12(b)(6), a defendant may move to dismiss an action arguing that it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while conclusory legal allegations are not entitled credit. Id. Second, the Court must "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Schatz, 669 F.3d at 55. If they do not, then dismissal is warranted. See Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

## III.    Factual Background

For the purposes of the motion to dismiss, D. 14, the Court confines itself to and accepts as true all well-pleaded facts in the FAC.

Ippolito was a mathematics teacher at Brockton High School ("BHS") who had been employed by Brockton in Brockton Public Schools ("BPS") since 2016. D. 11 ¶¶ 3, 7. Since he began teaching at BPS, Ippolito has been a "vocal critic[]" of Brockton and BPS. Id. ¶ 20; see id. ¶ 9. On June 6, 2023, Ippolito attended a School Committee meeting during which he spoke

2

against BPS's planned layoffs of hundreds of teachers for the 2023-2024 school year and organized a union coalition to "pressure the city of Brockton to prioritize city funds for the schools and to refrain from the planned cuts." Id. ¶¶ 11-13.  On January 1, 2024, halfway through the 2023-2024 school year, McCaskill became BHS's new principal and, as alleged by Ippolito, adopted tactics (i.e., "warehous[ing]" and not educating students) to mask the need to refrain from teacher layoffs. Id. ¶¶ 14, 17-18, 23.  Ippolito criticized McCaskill's tactics and publicly criticized the school administration and Brockton throughout the school year. Id. ¶¶ 19, 23-24,  27.

As alleged, beginning in February 2024, at Brockton's direction, McCaskill engaged in "a series of retaliatory actions" against Ippolito in response to Ippolito's criticism of him, BPS and Brockton. Id. ¶ 28.  On March 20, 2024, two days after Ippolito issued a candidate statement for Vice President of the BEA and 75 minutes before the election for said position, McCaskill, allegedly at Brockton's direction, called Ippolito into his office and presented him with a document that contained "serious student-originated allegations against [Ippolito]" from a student in Ippolito's class. Id. ¶¶ 30-33.  Ippolito refuted the claims. Id. ¶ 32.  McCaskill subsequently told BPS's Assistant Superintendent, Kathleen F. Moran ("Moran"), and head of Human Resources that Ippolito took actions that were "detrimental to the school community." Id. ¶ 34.  As alleged, McCaskill also communicated his efforts to "keep administrators apprised of his progress in implementing [Brockton]'s retaliation program" against Ippolito to Moran. Id. ¶ 35.

A week later, on March 27, 2024, McCaskill contacted a Brockton police officer assigned to BHS to report that Ippolito had a "'change in mental status,'" requiring him to be "'pink papered.'" Id. ¶¶ 36-37 & n.1.  As alleged, McCaskill did so because Ippolito was making "[r]andom statements about good deeds . . . and various achievements," "[unable] to 'stay on the same topic," his "conversations . . . [were] all over the place," and he was "[s]peaking quickly."

3

Id. ¶ 64.[1]  Additionally, a student reported that Ippolito was "laying on the floor and desk and walking into random classrooms that were in session speaking."  Id. ¶¶ 46, 64.  Subsequently, during Ippolito's afternoon free period, BHS's Assistant Principal, Kevin Rooney ("Rooney"), approached Ippolito at McCaskill's behest and asked Ippolito to follow him to his office.  D. 11 ¶ 44.  Once there, Rooney asked Ippolito about a "student report" that he was "laying on desks" and "rolling around on the floor."  Id. ¶ 46.  Rooney also asked Ippolito whether he had been crying downstairs, which Ippolito denied.  Id.  Thereafter, McCaskill entered the office with two Brockton police officers.  Id. ¶ 47.  When Ippolito asked for an explanation, an officers informed him that "there were individuals 'concerned about him' and that they intended to have him evaluated."  Id. (emphasis omitted).  The two police officers and McCaskill then stepped out of the room and Casandra Dos Anjos ("Dos Anjos"), a licensed mental health counselor employed with Community Counseling of Bristol County, entered the office and again asked Ippolito about "laying on desks" and "rolling on the floor."  Id. ¶ 49; see id. ¶¶ 55, 57.  Ippolito told her that he "was fine," id. ¶ 50, but Dos Anjos informed Ippolito that the administration wanted him to undergo a "voluntary" evaluation that "would help ease their concerns," id. ¶ 50.  During this interaction, Dos Anjos described Ippolito as having "a manic state of mind."  Id. ¶ 58.  After speaking with Ippolito, Dos Anjos "made the decision to involuntarily transport [] Ippolito" to Good Samaritan Medical Center ("Good Samaritan"), id. ¶ 56, and "initate[d] involuntary admission" under Mass. Gen. L. c. 123, § 12, see id. ¶ 55.

---

[1] In support of their motion to dismiss, Defendants submit several exhibits (including the full police report from this incident which is cited in part in the complaint, id. ¶¶ 56, 58, 64) and urge the Court to consider these documents in deciding the present motion to dismiss, D. 15 at 7-8, which Ippolito opposes, D. 18 at 7-8.  The Court declines to consider these documents at this juncture and has relied solely on the allegations in the complaint.

Upon exiting Rooney's office, Ippolito encountered two additional EMTs, the two police officers from earlier, McCaskill and a stretcher.  Id. ¶¶ 51-52.  As alleged, McCaskill told Ippolito to "Get on the stretcher," and when Ippolito responded that Dos Anjos told him the evaluation was optional and that he wanted to go home, one of the police officers, allegedly at McCaskill's direction, told him to "'Get on that stretcher now or else we're gonna put you on it!'"  Id. ¶ 53.  This confrontation allegedly occurred "during the final period of the school day, when students w[ere] passing the administrative offices."  Id. ¶ 63.  Ippolito was subsequently involuntarily transported and admitted to Good Samaritan.  Id. ¶¶ 56-59, 65.  Ippolito was later transported to Pembroke Hospital, where he was held involuntarily until April 5, 2024.  Id. ¶¶ 59-60.

On April 18, 2024, after Ippolito signed himself out of the hospital, Ippolito attended a meeting with Moran, McCaskill, a Massachusetts Education Association union representative and the local BEA President during which Moran told him that he was required to produce medical documentation prior to returning to work.  Id. ¶¶ 60, 67.  The next day, on April 19, 2024, Ippolito produced the requested documentation to Moran who subsequently placed him on paid administrative leave and "required him to undergo an independent medical examination."  Id. ¶ 68.  On April 22, 2024, Moran informed Ippolito that BHS had conducted an "'internal investigation'" and barred him from all school property.  Id. ¶ 69.  On May 3, 2024, Ippolito submitted an additional return-to-work letter from a medical professional but Moran rejected his return-to-work request.  Id. ¶¶ 70-71.  Ippolito again attempted, unsuccessfully, to return to work after Moran continued to require an independent medical examination on June 3, 2024.  Id. ¶ 72.  McCaskill and BPS did not allow Ippolito to return to BHS for the remainder of the 2023-2024 school year and thereafter, Brockton refused to reinstate Ippolito for the following school year.  Id. ¶¶ 73-74.

## IV.    Procedural History

Ippolito initiated this lawsuit on December 18, 2025, D. 1, and later filed the operative FAC, D. 11.  Defendants now have moved to dismiss the FAC.  D. 14.  The Court heard the parties on the pending motion and took this matter under advisement.  D. 27.

## V.    Discussion

### A.    <u>Count I:  42 U.S.C. § 1983</u>

In Count I, Ippolito asserts claims under 42 U.S.C. § 1983 against Brockton, BPD and "McCaskill in his official capacity," alleging that "[Brockton]'s and BPD'[s] policy, practice, customer [*sic*], and failure to properly train its employees" deprived Ippolito of his First Amendment right to free speech, Fourth Amendment protections against unlawful seizure and Fourteenth Amendment due process rights.  D. 11 ¶¶ 86-89.  To assert a § 1983 action against a municipality, such as Brockton, Ippolito must establish municipal liability.  <u>Baez v. Town of Brookline, Mass. Brookline Police</u>, 44 F.4th 79, 82 (1st Cir. 2022).  Additionally, as § 1983 claims against municipal police departments and city officials in their official capacity, such as those asserted here against BPD and McCaskill in his official capacity, are both "deemed to be a suit against the municipality itself," <u>Murphy v. Town of Natick</u>, 516 F. Supp. 2d 153, 158 (D. Mass. 2007); <u>see</u> <u>Lay v. City of Lowell</u>, 759 F. Supp. 3d 247, 251 (D. Mass. 2024), Ippolito must also establish municipal liability to support his § 1983 claims against these defendants.[2]

---

[2] As Defendants note, D. 15 at 9, as Brockton is also named as a defendant in Count I, Ippolito's claims against BPD and McCaskill in his official capacity are also subject to dismissal on the ground that they are "unnecessarily duplicative of his claim against [Brockton]." <u>See</u> <u>Grant v. Grafton Cnty.</u>, No. 25-cv-00103-LM-TSM, 2026 WL 689856, at *14 & n.17 (D.N.H. Feb. 24, 2026), <u>report and recommendation approved,</u> No. 25-cv-103-LM-TSM, 2026 WL 688137 (D.N.H. Mar. 10, 2026).  Moreover, BPD is not a proper party to his § 1983 claims because it is "a non-person [that] consequently is not subject to suit." <u>Darsch v. Lynch</u>, No. 15-cv-13466-WGY, 2016 WL 299037, at *5 (D. Mass. Jan. 13, 2016) (citing <u>Johnson v. Rodriguez</u>, 943 F.2d 104 (1st Cir. 1991)).

Section 1983 liability cannot be established by a respondeat superior theory.  See Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 502 (1st Cir. 2011); Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009); Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (stating that "vicarious liability is inapplicable to . . . [Section] 1983 suits").  Rather, to prevail in a § 1983 action against a municipality, Ippolito must prove that the violation of his rights occurred because of a municipality's "'policy or custom.'"  Baez, 44 F.4th at 82 (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).  Policies and customs can be both official or unofficial, so they "include[] the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  Connick v. Thompson, 563 U.S. 51, 61 (2011) (citing cases).  Furthermore, under either scenario, the policy or custom "must have been the cause of and the moving force behind the deprivation."  Miller v. Kennebec Cnty., 219 F.3d 8, 12 (1st Cir. 2000) (citation and internal quotation marks omitted).  Accordingly, to establish municipal liability, a plaintiff must show:  (1) a constitutional violation, (2) a "policy or custom" of the City that (3) actually caused the plaintiff's injury and (4) "that the municipality possesses the requisite level of fault."  See Young v. City of Providence, 404 F.3d 4, 25-26 (1st Cir. 2005) (citing Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997)).  Defendants move to dismiss on the grounds that Ippolito has failed to plausibly allege a municipal policy or custom and has failed to allege constitutional violations connected to any such municipal policy.  D. 15 at 9-20.

Each of Ippolito's § 1983 claims fail at least for the reason that Ippolito has failed to plausibly allege the second element of municipal liability:  the existence of a municipal custom or policy.  Id. at 9-12.  Ippolito first argues that Brockton maintains a policy of removing staff members who are critical of Brockton and BPS.  D. 18 at 8-9.  As Ippolito does not plausibly allege

that Brockton maintained a formal or express policy to this effect, he presumably alleges the existence of an unofficial policy or custom.  While the existence of a custom or unofficial policy is a question of fact, "it is not a fact that can be baldly asserted at the pleading stage."  Griego v. City of Albuquerque, 100 F. Supp. 3d 1192, 1212-13 (D.N.M. 2015).  To adequately plead a custom or policy under Rule 12(b)(6), "[p]laintiffs cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists."  Green v. City of Mount Vernon, 96 F. Supp. 3d 263, 302 (S.D.N.Y. 2015) (quotations omitted); see also Griego, 100 F. Supp. 3d at 1212-13.  Here, the FAC alleges nothing beyond the conclusory allegations that such a policy existed and Ippolito was "one of the many staff members targeted" thereunder.  D. 11 ¶ 22; see id. ¶¶ 21-22, 43.  These threadbare allegations are insufficient to adequately plead an unofficial policy of targeting critics for removal.  See Lucien-Calixte v. David, 405 F. Supp. 3d 171, 179 (D. Mass. 2019) (dismissing § 1983 claim against the Town where plaintiff alleged only "conclusory charges" to show a municipal policy or custom); Comeau v. Town of Webster, Mass., 881 F. Supp. 2d 177, 187 (D. Mass. 2012) (dismissing § 1983 claim; concluding that "[p]laintiffs' formulaic allegation that the Board of Health 'had policies and customs in place' is precisely the type of blanket, conclusory allegation that the Supreme Court has determined should not be given credit when standing alone").

Ippolito also alleges that Brockton "failed to provide adequate training, supervision, or guidance to its police officers regarding the mental health assessment of individuals and the proper guidelines and procedures for civilly committing such individuals."  D. 11 ¶ 41; see id. ¶ 43.  Although a municipality may be liable under § 1983 if its employee's violation of an individual's rights is connected to the municipality's failure to adequately train its employees, City of Canton,

Ohio v. Harris, 489 U.S. 378, 388 (1989), this theory of municipal liability is the "most tenuous," Connick, 563 U.S. at 61.   As with other forms of municipal liability under § 1983, the municipality's failure to train must stem from its deliberate adoption or acceptance of policies or customs.  Canton, 489 U.S. at 389.  This may be shown only where the inadequate training reflects "deliberate indifference to the rights of persons with whom the police come into contact."  Id. at 388.  "[D]eliberate indifference is a stringent standard of fault," such that "[a] showing of simple or even heightened negligence will not suffice."  Cnty. Comm'rs of Bryan Cnty., 520 U.S. at 407-10 (internal quotation marks and citation omitted).  Rather, a city may be deemed deliberately indifferent when it is "on actual or constructive notice that a particular omission in [its] training program causes [officers] to violate citizens' constitutional rights" and fails to properly respond, either by providing appropriate training or through disciplinary action.  Connick, 563 U.S. at 61.  Thus, to succeed on a failure to train claim under this standard, a plaintiff must show:  (1) that the municipality failed to provide training to its employees; (2) that the municipality's employee violated the constitutional rights of the plaintiff; (3) that the failure to train was the "moving force" behind the plaintiff's injury; and (4) that the municipality should have been aware of the potential consequences of failing to train the employee such that the failure to do so constituted "deliberate indifference."  See Canton, 489 U.S. at 388-89.  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."  Connick, 563 U.S. at 62 (internal quotation marks and citation omitted).

Ippolito's conclusory allegation that Brockton had "knowledge that police officers frequently engage with individuals who are, or may be, in mental health crises," D. 11 ¶ 41, does not plausibly allege that Brockton had "actual or constructive notice that a particular omission in [Brockton's]  training  program  causes  [officers]  to  violate  citizens'  constitutional

9

rights," particularly as the FAC does not elucidate what "particular omission" in Brockton's training Ippolito contends caused his alleged harm, Connick, 563 U.S. at 61; see Barker v. City of Bos., 795 F. Supp. 2d 117, 122-23 (D. Mass. 2011) (allowing motion to dismiss § 1983 claim; concluding that allegations that municipal police department's rules "do not address mental illness," two individuals with mental illness were previously killed by the police and city council ordered hearings on department's procedures for responding to emergencies involving individuals with mental illness "fall short of the requisite showing that [the city] had a policy that was 'deliberately indifferent' to the constitutional rights of mentally ill individuals") (internal citation omitted). Further, the FAC does not sufficiently allege that there has been a pattern of enforcement of an unconstitutional policy, pattern or practice. See Summers v. City of Fitchburg, No. 23-cv-12849-ADB, 2024 WL 555815, at *8 (D. Mass. Feb. 12, 2024). Ippolito's threadbare allegations that "many individuals [have been] improperly civilly committed by Brockton police officers," D. 11 ¶ 42, and that he "was one such individual victimized," id. ¶ 43, are insufficient to meet this requirement. See Houle v. Laflamme et al., No. 20-cv-11524-IT, 2021 WL 3742459, at *4 (D. Mass. Aug. 24, 2021) (concluding that allegations that city "has a practice of failing to properly investigate willful violations of the constitutional rights of its citizens . . . are insufficient to state a claim for municipal liability under the plausibility pleading standard") (internal citation omitted); cf. Bochart v. City of Lowell, 989 F. Supp. 2d 151, 155 (D. Mass. 2013) (concluding plaintiff plausibly alleged failure to train where "complaint cites six reports of alleged excessive force, three reports of alleged misuse of pepper spray, and three reports of denial of medical treatment in a fifteen-year period" two of which occurred "within two months of the events at issue"). Ippolito, therefore, has not plausibly alleged that Brockton maintained a custom or policy based on a failure to train theory.

10

As Ippolito has failed to plausibly allege a municipal custom or policy, Ippolito has failed to plausibly allege municipal liability to support his § 1983 claims against Defendants.  See Winfield, 305 F. Supp. 3d at 297 (dismissing § 1983 claim because plaintiffs "have not pled sufficient facts to support a Monell claim because they fail to identify a municipal policy or custom and also fail to show the causal link between the policy or custom and their injury").  Accordingly, the Court dismisses Count I.

### B.    Count II:  Massachusetts Substantive Due Process

In Count II, Ippolito alleges that McCaskill violated Mass. Gen. L. c. 12, § 11I by "fabricat[ing] charges of dangerousness," against Ippolito to remove him from the workplace and place him on leave, D. 11 ¶ 92, thus interfering with his "right to continued employment," id. ¶ 94. To establish a claim under Mass. Gen. L. c. 12, § 11I, a plaintiff must demonstrate first that "his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth . . . has been interfered with, or attempted to be interfered with, and . . . that the interference or attempted interference was by 'threats, intimidation or coercion.'"  Bally v. Ne. Univ., 403 Mass. 713, 717 (1989) (quoting Mass. Gen. L. c. 12, § 11H); Kennie v. Nat. Res. Dep't of Dennis, 451 Mass. 754, 759 (2008) (quoting Buster v. George W. Moore, Inc., 438 Mass. 635, 644 (2003)).

Even assuming *arguendo* that Ippolito has plausibly alleged that he has a secured right to his continued employment of which he was deprived by being "removed from the workplace [and] placed on leave," D. 11 ¶ 94,[3] his claim fails at least for lack of allegations of "threats, intimidation

---

[3] In his opposition, Ippolito argues that "the alleged unlawful involuntary admission and false reporting regarding Ippolito's interaction with a female student were intended to discourage Ippolito from exercise of freedom of speech."  D. 18 at 17.  This assertion is untethered from the MCRA claim alleged in the FAC, which focuses on McCaskill's alleged interference with

11

or coercion." See Mass. Gen. L. c. 12, § 11H. In assessing whether a defendant's conduct constitutes a threat, intimidation or coercion under the MCRA, the Court employs a reasonable person standard, Haufler v. Zotos, 446 Mass. 489, 505 (2006), under which "non-physical acts rarely support a basis for recovery," 3137, LLC v. Town of Harwich, 126 F.4th 1, 13 (1st Cir. 2025). Here, the FAC does not allege any physical acts by McCaskill or anyone allegedly under McCaskill's direction. See D. 11 ¶¶ 36-74. As the First Circuit has "'repeatedly stated, the exception for MCRA claims based on non-physical coercion remains a narrow one, and it should not be invoked unless the record resembles the sort of physical, moral, or economic pressure that courts have found sufficient to support a claim under this statute.'" 3137, LLC, 126 F.4th at 13 (quoting Salmon v. Lang, 57 F.4th 296, 318 (1st Cir. 2022)). While case law as to what constitutes non-physical coercion is unsettled, courts have typically found that non-physical coercion "require[s] a pattern of harassment and intimidation." Thomas v. Harrington, 909 F.3d 483, 493 (1st Cir. 2018) (internal citation omitted).

Here, Ippolito alleges that on March 27, 2024, McCaskill contacted Brockton police and "falsely claimed" that Ippolito had a "'change in mental status'" that required him to be "'pink papered,'" D. 11 ¶ 37, ultimately prompting his involuntary admission to Good Samaritan, id. ¶¶ 37-61, and that thereafter, McCaskill refused to allow Ippolito to return to BHS to complete the 2023-2024 school year, id. ¶ 73; see id. ¶¶ 90-95. Even viewed together with the allegation that McCaskill confronted Ippolito about "student-originated allegations" before the BEA elections two weeks prior, id. ¶ 31, these allegations fall short of alleging a pattern of harassment sufficient to qualify for the narrow exception to non-physical coercion in a MCRA claim. See Salmon, 57

---

Ippolito's "right to continued employment." D. 11 ¶¶ 90-95. Regardless, this claim fails for the same reasons discussed herein.

F.4th at 317 (concluding that defendant's request to have police escort plaintiff from school building did not constitute intimidation or coercion where "evidence of 'physical force' or 'unwarranted heavy-handed use of police power' was not subsequently developed") (internal citation omitted); cf. Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 594-95 (Mass. App. Ct. 2001) (concluding repeated verbal harassment, relocation of work site and multiple failed attempts to suspend plaintiff without pay and deprive him of benefits supported a MCRA claim); Sheehan v. Town of Carver, MA, No. 24-cv-12347-ADB, 2025 WL 1333711, at *27 (D. Mass. May 7, 2025) (concluding plaintiff satisfied MCRA's intimidation requirement as "Plaintiff's allegations sufficiently plead a conspiracy between [Defendants] to violate her First Amendment rights, and this conspiracy included a sustained online and in person campaign of harassment and intimidation").

For at least the reasons stated above, Count II fails to state a claim against McCaskill and, accordingly, the Court dismisses this claim.

### C.    Count III:  Mass. Gen. L. c. 214, § 1B

In Count III, Ippolito alleges that McCaskill violated Mass. Gen. L. c. 214, § 1B by "falsely sectioning and unlawfully transporting him by stretcher in front of his students and colleagues, and attempting to force him to undergo evaluation by a medical professional of their choosing."  D. 11 ¶¶ 96-98.  The Massachusetts Privacy Act provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy."  Mass. Gen. L. c. 214, § 1B. "'To sustain a claim for invasion of privacy, the invasion must be both unreasonable and substantial or serious.'"  Polay v. McMahon, 468 Mass. 379, 382 (2014) (quoting Nelson v. Salem State College, 446 Mass. 525, 536 (2006)).  "Although most of the case law under the statute has involved public disclosure of private facts, 'a plaintiff may also support a claim of invasion of

privacy by showing that a defendant has intruded unreasonably upon the plaintiff's "solitude" or "seclusion."'" Kunz v. Town of Northbridge, No. 14-cv-13894-TSH, 2017 WL 3927616, at *12 (D. Mass. Mar. 13, 2017) (quoting Polay, 468 Mass. at 382 (quoting Ellis v. Safety Ins. Co., 41 Mass. App. Ct. 630, 637 (1996))), report and recommendation adopted, No. 14-cv-13894, 2014 WL 12733702 (D. Mass. Oct. 17, 2014). "Generally, the question of whether an intrusion qualifies as unreasonable, as well as either substantial or serious, is one of fact." Id. "Factors considered include 'the location of the intrusion, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion.'" Id. (quoting Polay, 468 Mass. at 382). "'In determining whether a defendant committed an unreasonable intrusion, [the court] balance[s] the extent to which the defendant violated the plaintiff's privacy interests against any legitimate purpose the defendant may have had for the intrusion.'" Id. (alterations in original) (quoting Polay, 468 Mass. at 382).

In his opposition, Ippolito indicates that he is proceeding under an intrusion upon solitude theory, D. 18 at 18-19, and argues that his involuntary admission constitutes an unreasonable intrusion upon his privacy. Id. Although it is unclear if that Ippolito will prevail on this claim after a factual record is developed, Kunz, 2017 WL 3927616, at *17 (granting summary judgment to defendant on such claim, concluding that "to the extent [plaintiff]'s privacy was invaded, [defendant] cannot be said to be the cause of such invasion" because, even as alleged, "the decision to detain [plaintiff] was made by an independent decision maker"), it has been plausibly alleged that McCaskill was acting in concert with others to have Ippolito sectioned,  D. 11 ¶¶ 45-56, and, among, other things, "fabricated charges of dangerousness" to ensure that this happened, id. ¶ 92, which would distinguish this case from others where there were at least allegations of dangerousness.   see Kunz, 2017 WL 3927616, at *12; see also Winfield, 305 F. Supp. 3d at 295

14

(concluding on summary judgment that officers had probable cause to believe that plaintiff might harm herself for involuntary admission under Mass. Gen. L. c. 123, § 12(a)).

Accordingly, the Court denies the motion to dismiss as to Count III.[4]

### D.      Count IV:  Intentional Infliction of Emotional Distress

In Count IV, Ippolito asserts an intentional infliction of emotional distress claim against McCaskill, alleging that McCaskill intentionally caused him emotional distress by "his concerted illegal actions in concocting a scheme to unlawfully section [] Ippolito." D. 11 ¶¶ 99-102.  To state a claim of intentional infliction of emotional distress under Massachusetts law, a plaintiff must show:  "(1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it."  Limone v. United States, 579 F.3d 79, 94 (1st Cir. 2009) (alteration in original) (quoting Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976)) (internal quotation marks omitted).  Although "[t]he standard for making a claim of intentional infliction of emotional distress is very high," Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996) (citing Agis, 371 Mass. at 145), a plaintiff states a claim for same if he plausibly alleges conduct that is "so outrageous in character, and so extreme in degree, as to go

---

[4] Although Ippolito also appears to assert a Mass. Gen. L. c. 214, § 1B claim based on McCaskill's alleged attempt to "force him to undergo evaluation by a medical professional of their choosing," D. 11 ¶ 98, he advances no arguments as to this claim in his opposition.  This claim is therefore waived and does not survive Defendants' motion to dismiss.  See Tian v. Aspen Tech., Inc., 53 F. Supp. 3d 345, 369 n.8 (D. Mass. 2014) (concluding that any opposition to dismissal of claim is waived where plaintiff failed to adequately address claim in her opposition to defendant's motion to dismiss).

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987) (quoting Restatement (Second) of Torts § 46, comment d (1965)) (internal quotation mark omitted). Recovery for such a claim generally "requires more than 'that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" Doyle, 103 F.3d at 195 (quoting Foley, 400 Mass. at 99).

Although a close call given the high standard that applies to this claim, the Court cannot conclude that Count IV has not been plausibly pled. Based on the FAC, the first element has been sufficiently alleged (that McCaskill, at least, should have known that his conduct would inflict emotional distress, D. 11 ¶ 100) as has the fourth element (that Ippolito suffered extreme distress in being involuntarily carted away from the school, in sight of others, and sectioned, id. D. ¶ 102). As to whether McCaskill engaged in "extreme and outrageous" conduct (the second element), at least at this juncture, the allegations that, in retaliation against Ippolito, he fabricated allegations of dangerousness and orchestrated his public removal for sectioning, id. ¶¶ 47-58, reflects allegations in other cases that have survived a motion to dismiss. For example in Sharma, the court found that an employee had plausibly alleged that his employer engaged in extreme and outrageous conduct where he "subjected [the employee] to unwarranted medical evaluations, told [the employee's] co-workers that he was dangerous and potentially violent, and asked the Board to fire him" in retaliation for the employee's refusal to break the law. Sharma v. Bd. of Trs. of Univ. of Illinois, 404 F. Supp. 3d 1183, 1205 (N.D. Ill. 2019); Wagenmann v. Adams, 829 F.2d 196, 213-14 (1st Cir. 1987) (affirming judgment against private individuals and police officers for concerted effort to effectuate false arrest and sectioning of plaintiff). It will also remains to be seen whether,

16

after discovery, that Ippolito will be able to show that McCaskill was the "cause" of his emotional distress (as required in the third element for this cause of action), but he has plausibly alleged a factual basis for same.  Id. D. ¶ 102; see id. ¶¶ 47-58.

Accordingly, the Court denies the motion to dismiss as to Count IV.

## VI.   Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss, D. 14, as to Counts I-II, but DENIES it as to Count III-IV.  Accordingly, the only remaining Defendant is McCaskill, named in Counts III-IV and the other Defendants are DISMISSED.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge